JENNIFER B. SHOMSHOR
Nevada Bar No. 13248
CHRISTOPHER M. PETERSON
Nevada Bar No. 13932
NICOLE C. LEVY
Nevada Bar No. 15061
AMERICAN CIVIL LIBERTIES UNION OF NEVADA
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Tel./Fax. (702) 830-9205 / (702) 366-1331
Email: Shomshor@aclunv.org
Email: Peterson@aclunv.org
Email: Levy@aclunv.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| Nevada Press Association,<br><br>        Plaintiff(s),<br><br>    vs.<br><br>Steve Sisolak, Governor; Charles Daniels, Director of the Nevada Department of Corrections; William Allan Gittere, Warden of Ely State Prison; the State of Nevada, ex. rel. Department of Corrections; and Does 1–10, Unknown NDOC Personnel, in their official capacities as Agents of NDOC,<br><br>        Defendant(s). | Case Number    21-317<br><br>EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

COMES NOW the Nevada Press Association, by and through undersigned counsel, to respectfully move this Court pursuant to Fed. R. Civ. P. 65, and the applicable case law for immediate *ex-parte* issuance of a Temporary Restraining Order and, following notice, a Preliminary Injunction enjoining the Defendants from executing Zane Floyd using the procedure described in the State's Execution Manual, and following notice and hearing, issue an order enjoining the Defendants from engaging in the aforementioned wrongful conduct that will result in certain substantial and irreparable harm to the Plaintiff and the public.

1    Emergency injunctive relief is necessary because the Defendants[1] have, without any basis

2    or merit, determined to move forward with Floyd's execution in a manner that (1) prevents the

3    Plaintiff and the public from observing Floyd's execution in its entirety, (2) uses a drug cocktail

4    that includes a paralytic agent that will necessarily prevent the public from having full information

5    related to Floyd's experience during the execution, and (3) has imbued the Director of NDOC with

6    "sole discretion" without limitation as to what witnesses will be permitted the view the execution.

7    Such actions would necessarily interfere with the Plaintiff's and the public's right to observe and

8    report on Floyd's execution, rights clearly established under the First Amendment of the United

9    States Constitution.

10    By contrast, the Defendant's suffers no injury if Floyd's execution is delayed to ensure

11    their procedure complies with the Constitution because it would only temporarily maintain a *status*

12    *quo* that has existed for 21 years since Floyd's original sentencing on July 22, 2000.

13    The Plaintiff seeks injunctive relief barring the State from executing Floyd in a manner that

14    will violate the Nevada Press Association's and the public's rights under the First Amendment and

15    42 U.S.C. § 1983. As Floyd has an impending execution date, a Preliminary Injunction is necessary

16    to allow the Plaintiff to litigate its claims before the execution occurs, and the Plaintiff requests a

17    hearing on this motion. The Plaintiff also requests a Temporary Restraining Order prohibiting the

18    State from performing the execution of Floyd pursuant to the procedure described in the State's

19    Execution Manual until a preliminary hearing is held.

20    WHEREFORE, for all the foregoing reasons the Nevada Press Association requests entry

21    of an order granting the Motion for Temporary Restraining Order and Preliminary Injunction

22    against the Defendants.

---

[1] For ease of reference, and to distinguish between past actions taken by persons who are also Defendants here, the Plaintiff refers to Defendants variably as "Defendants," "the State," and/or "NDOC" where appropriate. The Plaintiff notes, however, that its use of any of these phrases should not be interpreted as limiting the scope of their request for relief, which is brought against each and all of the Defendants.

## MEMORANDUM IN SUPPORT OF THE PLAINTIFF'S MOTION FOR A TEMPROARY RESTRAINING ORDER AND PRELIMINARY INJUCTION

The Nevada Press Association by counsel and pursuant to Fed. R. Civ. P. 65 has moved the Court for a Temporary Restraining Order and Preliminary Injunction enjoining the State from executing Zane Floyd using the procedure described in the State's Execution Manual. This brief is filed in support of that Motion.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 9

II.   RELEVANT FACTUAL HISTORY.................................................................... 10

   A.   The historical significance of Zane Floyd's execution .................................... 11

   B.   Other relevant procedures described in the Execution Manual....................... 15

III.  JURISDICTION AND VENUE ........................................................................... 16

IV.  LEGAL STANDARD........................................................................................... 17

V.   LEGAL ARGUMENT......................................................................................... 17

   A.   The Plaintiff is likely to succeed on the merits of this case because the State's procedures clearly violates the First Amendment by interfering with the press's ability to observe Zane Floyd's execution in its entirety and without obstruction......................... 17

       1.   The procedures described in the Execution Manual violate the Plaintiff's First Amendment rights because the described procedures use blinds to prevent witnesses from observing Floyd while he is inside the Execution Chamber and suggest that witnesses will not be able to hear what is occurring in the Chamber when the blinds are closed. .............................................................................................. 19

       2.   The State's procedures violate the Plaintiff's First Amendment rights when it gives the Director of the Nevada Department of Corrections unfettered authority to deny requests from media representatives for an invitation to Floyd's execution ........... 20

       3.   The State's procedures violate the Plaintiff's First Amendment rights by failing to providing an alternative way to observe Floyd's execution to press outlets that have been denied an invitation to the execution such as broadcasting the execution on closed circuit television............................................................................................ 22

       4.   The States' use of a paralytic agent to create a "chemical curtain" violates the Plaintiff's First Amendment right observe Floyd's execution it prevents the Plaintiff from observing and accurately report on the effects of Nevada's experimental drug cocktail. ................................................................................................. 23

   B.   If this Motion is denied, the Plaintiff will suffer immediate and irreparable harm: there will be no way to reverse the harm to the Plaintiff's First Amendment rights if Floyd is executed under the current procedures described in the Execution Manual .................. 25

C.   Considering that the Plaintiff, as the press, are the public's eyes and ears at Zane Floyd's execution, the public interest and the balance of equities favor granting the Temporary Restraining Order and Preliminary Injunction. .................................................................. 25

VI.  CONCLUSION ................................................................................................. 27

## TABLE OF AUTHORITIES

Cases

*California First Amendment Coalition v. Calderon*, 150 F.3d 976, 978 (9th Cir. 1998) .......... 24

*California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002) .......... passim

*Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) .......... 23

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) .......... 17, 25

*Entertainment Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1008 (S.D. Ind. 2001) .......... 23

*First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019) .......... passim

*Guardian News & Media*, 225 F.Supp.3d 859, 869 (D. Ariz. 2016) .......... 21

*Michel v. Bare*, 230 F. Supp. 2d 1147, 1159 (D. Nev. 2002) .......... 25

*Quiroga v. Chen*, 735 F. Supp. 2d 1226 (D. Nev. 2010) .......... 17

*Turner v. Safley*, 482 U.S. 78, 89 – 91 (1987) .......... 18

Statutes

28 U.S.C. § 1331 .................................................................................................... 16

28 U.S.C. § 1343 .................................................................................................... 16

28 U.S.C. § 1391(b) ............................................................................................... 16

28 U.S.C. § 2201 .................................................................................................... 16

28 U.S.C. § 2202 .................................................................................................... 16

42 U.S.C. § 1983 .................................................................................................... 16

NRS 176.355 ......................................................................................................... 11

NRS 176.355(4) ..................................................................................................... 22

Other Authorities

*Alfentanil*, PubChem (National Library of Medicine),
    https://pubchem.ncbi.nlm.nih.gov/compound/alfentanil (last visited July 19, 2021) .............. 13

Dana Ford, *Oklahoma executes Charles Warner*, CNN, January 16, 2015,
    https://www.cnn.com/2015/01/15/us/oklahoma-execution-charles-frederick-warner/index.html
    ........................................................................................................................ 15

Daniel Nichanian, *Nevada Prosecutors are Standing in the Way of Abolishing the Death Penalty*, The Appeal, May 7, 2021, https://theappeal.org/politicalreport/nevada-prosecutors-are-standing-in-the-way-of-abolishing-the-death-penalty/ ............................................... 12

David Lat & Zachary Shemtob, *The Execution Should Be Televised: An Amendment Making Executions Public*, 78 Tenn. L. Rev. 859, 864 (2011).............................................. 23

Debbie Sigelbaum, *America's 'inexorably' botched executions*, BBC News, August 1, 2014, https://www.bbc.com/news/magazine-28555978 ........................................... 14

Defendant's Notice of Filing, Exhibit A – Redacted Execution Manual, Floyd v. Daniels, No. 3:21-cv-00176-RFB-CLB (D. Nev. June 10, 2021), ECF No. 93 ......................... 12, 15, 16, 20

Erik Eckholm, *Arizona Takes Nearly 2 Hours to Execute Inmate*, New York Times, July 23, 2014, https://www.nytimes.com/2014/07/24/us/arizona-takes-nearly-2-hours-to-execute-inmate.html ........................................................................... 15

Josh Sweigart, *Ohio executes McGuire, killer of Preble County woman in 1989*, Dayton Daily News, January 16, 2014, https://www.daytondailynews.com/news/local/ohio-executes-mcguire-killer-preble-county-woman-1989/ddQzdQpjWlwl9q4pir9oEL/ ................................... 14

Katie Fretland, *Scene at botched Oklahoma execution of Clayton Lockett was 'a bloody mess'*, The Guardian, December 13, 2014, https://www.theguardian.com/world/2014/dec/13/botched-oklahoma-execution-clayton-lockett-bloody-mess ............................... 14

Ken Ritter & Sam Metz, *Governor, top Democrat call Nevada death penalty repeal dead*, AP News, May 13, 2021, https://apnews.com/article/nevada-las-vegas-mass-shooting-b0ff30e95183f66012b88f5f0c17273f ........................................................ 12

Ken Ritter, *Nevada plans to use 3 or 4 drugs for late-July execution*, AP News, June 10, 2021, https://apnews.com/article/government-and-politics-nv-state-wire-nevada-executions-04c612f234542476daa6d1f6f329729b ................................................... 13

*KETAMINE HYDROCHLORIDE- ketamine hydrochloride injection, solution, concentrate*, Hospira, Inc., *available at* http://labeling.pfizer.com/ShowLabeling.aspx?id=4485 (last visited July 19, 2021) ........................................................................... 13

Khaleda Rahman, *Nevada is Trying to Abolish the Death Penalty – Democrats Stand In the Way*, Newsweek, May 11, 2021, https://www.newsweek.com/why-nevada-must-abolish-death-penalty-1590054 ........................................................................ 12

Khaleda Rahman, *Nevada Set to Execute Death Row Inmate for First Time in 15 Years*, Newsweek, June 8, 2021, https://www.newsweek.com/nevada-set-execute-first-inmate-15-years-1598519........................................................................... 11

Laurie Roberts, *Arizona Needs a Timeout After Botched Execution*, Arizona Republic, July 23, 2014, http://www.azcentral.com/story/laurieroberts/2014/07/23/woods-execution-botched/13073777........................................................................... 14

Marcella Corona, *How will Scott Dozier die? Experts weigh in on Nevada's experimental execution cocktail*, Reno Gazette-Journal, Nov. 3, 2017, https://www.rgj.com/story/news/2017/11/03/medical-experts-explain-effects-lethal-injection-drugs-nevada-execution/822497001/ .................................................................................................. 13

Michael Lyle, *Prosecutor senators pressed to quit foot-dragging on death penalty abolish bill*, Nevada Current, May 11, 2021, https://www.nevadacurrent.com/2021/05/11/prosecutor-senators-pressed-to-quit-foot-dragging-on-death-penalty-abolition-bill/ ................................. 12

Phillip R. Corlett, et al., *Frontal responses during learning predict vulnerability to the psychogenic effects of ketamine: linking cognition, brain activity, and psychosis*, Arch Gen Psychiatry, 2006 Jun; 63(6):611-21, https://pubmed.ncbi.nlm.nih.gov/16754834/ ................. 13

Ryan Fan, *The Gruesome First Gas Chamber Execution*, Medium, March 19, 2021, https://medium.com/crimebeat/the-gruesome-first-gas-chamber-execution-a7440dda2d8b ... 11

Sam Metz, *Blue states chart diverging paths on death penalty debate*, AP News, April 21, 2021, https://apnews.com/article/race-and-ethnicity-government-and-politics-nevada-legislature-las-vegas-mass-shooting-f96adbb830e8757bc501f919b276bddc ................................................... 12

Scott Christianson, *Fatal Airs: The Deadly History and Apocalyptic Future of Lethal Gases that Threaten Our World* 50 (Praeger 2010).................................................................................. 11

Sean Whaley, *Nevada's new $860,000 execution chamber is finished but gathering dust*, Las Vegas Review-Journal, November 27, 2016, https://www.reviewjournal.com/crime/nevadas-new-860000-execution-chamber-is-finished-but-gathering-dust/. ........................................... 11

*State-by-State Lethal Injection Protocol*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/lethal-injection/state-by-state-lethal-injection-protocols (last visited July 19, 2021).................................................................................... 13

Tabitha Mueller & Michelle Rindels, *Opponents of the death penalty turn up the heat as abolition bill's future remains murky*, The Nevada Independent, May 11, 2021, https://thenevadaindependent.com/article/opponents-of-the-death-penalty-turn-up-the-heat-as-abolition-bills-future-remains-murky ................................................................................. 12

Rules

Fed. R. Civ. P. 65(a) ................................................................................................................ 17

Constitutional Provisions

U.S. Const. amend. I .......................................................................................................... 9, 16, 17

## I.       INTRODUCTION

Since they first began in this country, executions have been public affairs. Allowing the community access to these events served as a deterrent against future criminal conduct but also a way for the public to accept responsibility for the death of the condemned. In some communities, the jury and the judge that issued the death sentence were even required by law to attend the execution. However, throughout the Twentieth Century, executions migrated from the town square to state penitentiaries where security concerns limited attendance, and with this transition, news reporters became essential witnesses for the public, describing the deaths of the condemned and often disputing official accounts from the event when government errors lead to agonizing final moments. In *California First Amendment v. Woodford Coalition*, the Ninth Circuit Court of Appeals, reflecting on this history and the importance of public access to executions, formally recognized that the public and the press have a right under the First Amendment of the United States Constitution to observe state executions. 299 F.3d 868 (9th Cir. 2002).

The State now plans to execute Zane Floyd by lethal injunction. While any execution is an event of public concern, Floyd's has more import than most. This execution will be the first execution in Nevada in over 15 years. It will be the first to be held at Ely State Prison, whose chamber cost the public $860,000 to build. It will be the first time that any state has attempted to use a drug cocktail comprised of fentanyl or alfentanil; ketamine; potassium chloride or potassium acetate; and potentially cisatracurium. It will be the first time that either alfentanil or ketamine will ever be used to perform a lethal injection. Finally, it will be the first time an inmate will be fully conscious during an execution by lethal injection since none of the drugs in the protocol are known to induce unconsciousness. Considering the historical nature of Floyd's execution and that approximately 7.1% of lethal injections performed in this country are "botched," this is an execution where the public's First Amendment right to access and oversight of execution are particularly critical.

However, the State's current protocols will necessarily interfere with that right. First, the State will prevent witnesses from observing Floyd's entry into the Execution Chamber and the

initial preparations for the execution, closing the Execution Chamber's "Viewing blinds" until Floyd is secured to the execution table and his IV is in place. The State will also close the blinds if Floyd has an unexpected reaction to their untested cocktail, and it is unclear what witnesses will be able to hear in the Chamber besides Zane Floyd's final words after the blinds have been drawn back. Second, the State has reserved the right to add to their cocktail the chemical cisatracurium, a paralytic agent that does not induce death or reduce pain but only serves prevent witnesses from observing the effects the experimental cocktail is having on Floyd. Third, the protocol gives the Director of the Nevada Department of Corrections "sole discretion" to deny otherwise qualified witnesses the opportunity to observe the execution without providing any limits on that discretion. Finally, the protocol fails to provide an alternative method to observe the execution for witnesses that have been arbitrarily refused an invitation, such as closed-circuit television.

The Nevada Press Association, a domestic non-profit corporation comprised of Nevada press entities from across the state, has First Amendment rights to (1) witness the State's execution of Zane Floyd from the moment Floyd enters the Execution Chamber to when he is deceased and (2) to have full information of Floyd's experience as the execution proceeds. The State's procedures violate those rights. If the State are allowed to move forward with Floyd's execution without amending its procedures, the Plaintiff's rights will be irreparably harmed and the public denied full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies. A Temporary Restraining Order and Preliminary Injunction are essential to prevent these violations from happening.

## II.   RELEVANT FACTUAL HISTORY

Executions in the United States have traditionally been public affairs. *Woodford*, 299 F.3d at 875. These public displays have served multiple purposes, deterring similar misconduct, forcing the community to accept responsibility for sentencing one of its own to death, and holding the state executioners accountable if their conduct violated the Constitution.

As executions moved from the town square to the prison yard, limiting the number of witnesses in attendance, the press became the public's eyes and ears. Nevada law ensures that witnesses are always on hand at each execution,[2] and the media has always been keen to report whether the State is performing its most grim duty fairly and humanely, from the State's gruesome experimentation with the first gas chamber[3] to Nevada's current efforts to execute Zane Floyd in an untried execution chamber with an untested drug cocktail.

### A.    The historical significance of Zane Floyd's execution

While the death penalty has existed under law in Nevada from its days as a territory of the United States, the State has not performed an execution since April 26, 2006, a hiatus of over 15 years.[4] During this time, it closed the Nevada State Prison, the only prison to ever host an execution in Nevada, and built a new, $860,000 execution chamber at Ely State Prison.[5] The new chamber that has sat unused since construction concluded in 2016.

---

[2] *See* NRS 176.355 (requiring "not less than six reputable citizens over the age of 21 years" be present for an execution).

[3] Nevada performed the first ever gas chamber execution on February 8, 1924. Due to a miscalculation, most of the poisonous gas remained in its liquid state, and witnesses watched the condemned suffocate to death for approximately 10 minutes. Ryan Fan, *The Gruesome First Gas Chamber Execution*, Medium, March 19, 2021, https://medium.com/crimebeat/the-gruesome-first-gas-chamber-execution-a7440dda2d8b. Warden Dickerson, who over saw the execution, reported that "This method of execution, while no doubt painless, is not, in my judgment practical." Scott Christianson, *Fatal Airs: The Deadly History and Apocalyptic Future of Lethal Gases that Threaten Our World* 50 (Praeger 2010).  By comparison, newspapers described the execution as "the worst piece of official barbarity since the Dark Ages," and claimed that "One hundred years from now Nevada will be referred to as a heathen commonwealth controlled by savages with only the outward symbols of civilization." *Id.* at 50–51.

[4] Khaleda Rahman, *Nevada Set to Execute Death Row Inmate for First Time in 15 Years*, Newsweek, June 8, 2021, https://www.newsweek.com/nevada-set-execute-first-inmate-15-years-1598519.

[5] Sean Whaley, *Nevada's new $860,000 execution chamber is finished but gathering dust*,  Las Vegas Review-Journal, November 27, 2016, https://www.reviewjournal.com/crime/nevadas-new-860000-execution-chamber-is-finished-but-gathering-dust/

The State's efforts to conduct its first execution at Ely coincide with a recent public push to abolish the death penalty and a growing discussion as to whether the practice should stay on Nevada's books.[6] During Nevada's last state legislative session, the state House of Representatives passed a bill to end executions only to see the legislation die in the Senate judiciary committee without a hearing.[7] There was extensive coverage around the bill with politicians on both sides of the aisle speaking out in favor of its passage,[8] and many reports drew a connection between Clark County District Attorney Steve Wolfson's efforts to move forward with Zane Floyd's execution and his efforts to kill the abolition bill.[9]

Perhaps most significant from a national perspective is Nevada's intent to use an untested drug cocktail to execute Floyd. According to its Execution Manual Procedure ("EM") 103,[10] Nevada proposes to kill Floyd with either a three- or four-drug combination comprised of:

- Fentanyl or Alfentanil (depending on availability);

---

[6] Khaleda Rahman, *Nevada is Trying to Abolish the Death Penalty – Democrats Stand In the Way*, Newsweek, May 11, 2021, https://www.newsweek.com/why-nevada-must-abolish-death-penalty-1590054.

[7] Ken Ritter & Sam Metz, *Governor, top Democrat call Nevada death penalty repeal dead*, AP News, May 13, 2021, https://apnews.com/article/nevada-las-vegas-mass-shooting-b0ff30e95183f66012b88f5f0c17273f.

x[8] Sam Metz, *Blue states chart diverging paths on death penalty debate*, AP News, April 21, 2021, https://apnews.com/article/race-and-ethnicity-government-and-politics-nevada-legislature-las-vegas-mass-shooting-f96adbb830e8757bc501f919b276bddc.

[9] *See* Daniel Nichanian, *Nevada Prosecutors are Standing in the Way of Abolishing the Death Penalty*, The Appeal, May 7, 2021, https://theappeal.org/politicalreport/nevada-prosecutors-are-standing-in-the-way-of-abolishing-the-death-penalty/; Michael Lyle, *Prosecutor senators pressed to quit foot-dragging on death penalty abolish bill*, Nevada Current, May 11, 2021, https://www.nevadacurrent.com/2021/05/11/prosecutor-senators-pressed-to-quit-foot-dragging-on-death-penalty-abolition-bill/; Tabitha Mueller & Michelle Rindels, *Opponents of the death penalty turn up the heat as abolition bill's future remains murky*, The Nevada Independent, May 11, 2021, https://thenevadaindependent.com/article/opponents-of-the-death-penalty-turn-up-the-heat-as-abolition-bills-future-remains-murky.

[10] *See*, Defendant's Notice of Filing, Exhibit A – Redacted Execution Manual at 22, Floyd v. Daniels, No. 3:21-cv-00176-RFB-CLB (D. Nev. June 10, 2021), ECF No. 93.

- Ketamine;

- Cisatracurium; and

- Potassium Chloride or Potassium Acetate (depending on availability).

Cisatracurium is a paralytic agent that inhibits an inmate's ability to communicate but does not affect an inmate's "consciousness, awareness, pain or anxiety" during the execution.[11]

No state in the United States has previously used this combination of chemicals to perform a lethal injection,[12] and looking at the individual components, neither Alfentanil or Ketamine have ever been used in a lethal injection cocktail.[13] Both drugs have disturbing side effects: Alfentanil inhibits breathing potentially causing suffocation,[14] while Ketamine causes vomiting, psychosis, disorientation, and hallucinations.[15] Finally, none of the drugs in the cocktail are known to induce

---

[11] Marcella Corona, *How will Scott Dozier die? Experts weigh in on Nevada's experimental execution cocktail*, Reno Gazette-Journal, Nov. 3, 2017, https://www.rgj.com/story/news/2017/11/03/medical-experts-explain-effects-lethal-injection-drugs-nevada-execution/822497001/.

[12] Ken Ritter, *Nevada plans to use 3 or 4 drugs for late-July execution*, AP News, June 10, 2021, https://apnews.com/article/government-and-politics-nv-state-wire-nevada-executions-04c612f234542476daa6d1f6f329729b.

[13]*See*, *State-by-State Lethal Injection Protocol*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/lethal-injection/state-by-state-lethal-injection-protocols (last visited July 19, 2021) (listing all drugs used in lethal injection protocols across the country).

[14]*See*, *Alfentanil*, PubChem (National Library of Medicine), https://pubchem.ncbi.nlm.nih.gov/compound/alfentanil (last visited July 19, 2021) ("Serious, life-threatening, or fatal respiratory depression has been reported with the use of opioids, even when used as recommended. Respiratory depression, if not immediately recognized and treated, may lead to respiratory arrest and death.").

[15] Phillip R. Corlett, et al., *Frontal responses during learning predict vulnerability to the psychotogenic effects of ketamine: linking cognition, brain activity, and psychosis*, Arch Gen Psychiatry, 2006 Jun; 63(6):611-21, https://pubmed.ncbi.nlm.nih.gov/16754834/ ("High-dose ketamine produces perceptual aberrations . . . and delusion-like beliefs."); *see*, *KETAMINE HYDROCHLORIDE- ketamine hydrochloride injection, solution, concentrate*, Hospira, Inc., *available at* http://labeling.pfizer.com/ShowLabeling.aspx?id=4485 (last visited July 19, 2021) (labelling insert indicating that nausea and vomiting are potential side effects).

unconsciousness, a shortcoming that, in conjunction with the painful chemical potassium chloride, will likely lead to suffering before death.

Putting aside Nevada's troubled history with pioneering execution methods,[16] when states have experimented with new drugs or changed the dosages in lethal injection cocktails, these efforts have often ended in disaster. Considering that at least one study found that 7.1% of lethal injections in the United States were "botched," twice the rate of American executions generally, these grim results are not surprising.[17] Recently botched lethal injection executions include:

- Dennis McGuire in Ohio, where McGuire appeared to "gasp, snort and struggle for air" with his body "convulsing in an apparent attempt to breathe" roughly 10 minutes before he was announced dead.[18]

- Joseph R. Wood in Arizona, whose execution lasted 117 minutes as he died "like a fish on shore gulping for air."[19]

- Clayton Lockett in Oklahoma, where witnesses watched as he "groaned, writhed, lifted his head and shoulders off the gurney and said 'man'," after he was supposedly sedated.[20]

---

[16] *See supra* fn. 3.

[17] From 1890 to 2010, about 3% of all American executions were "botched." Debbie Sigelbaum, *America's 'inexorably' botched executions*, BBC News, August 1, 2014, https://www.bbc.com/news/magazine-28555978.

[18] Josh Sweigart, *Ohio executes McGuire, killer of Preble County woman in 1989*, Dayton Daily News, January 16, 2014, https://www.daytondailynews.com/news/local/ohio-executes-mcguire-killer-preble-county-woman-1989/ddQzdQpjWlwl9q4pir9oEL/.

[19] Laurie Roberts, *Arizona Needs a Timeout After Botched Execution*, Arizona Republic, July 23, 2014, http://www.azcentral.com/story/laurieroberts/2014/07/23/woods-execution-botched/13073777.

[20] Katie Fretland, *Scene at botched Oklahoma execution of Clayton Lockett was 'a bloody mess'*, The Guardian, December 13, 2014, https://www.theguardian.com/world/2014/dec/13/botched-oklahoma-execution-clayton-lockett-bloody-mess.

- Charles Warner in Oklahoma, who had been given a sedative but still described the injection as "feel[ing] like acid" and whose final words were, "My body is on fire."[21]

After botched executions, the press often served as an important counterbalance to the official narrative offered by the state. For example, Arizona's governor claimed Joseph R. Wood did not suffer and the procedure was conducted lawfully[22] even as newspapers reported that Wood "appeared to be in agony" as he died. *First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1073 (9th Cir. 2019) (summarizing newspaper reports from the incident).

### B.   Other relevant procedures described in the Execution Manual

In addition to describing the lethal injection cocktail combinations, the State's Execution Manual explains the procedures the State intends to follow for Floyd's execution, including how the Director will select the witnesses for the event and what the witnesses will be able to observe as Floyd's execution proceeds. Key procedures include:[23]

- EM 110.01, which states that Floyd's execution will begin with the "Execution Area Viewing Room blinds" closed and the Viewing Room lights full illuminated. The blinds will only be opened after (1) Floyd enters the Execution Chamber Room, (2) Floyd is secured to the execution table, (3) Floyd's IV has been connected, and (4) the Warden is alone in the Execution Chamber with Floyd. It also suggests that witnesses will not be able to hear anything inside the Chamber until after the blinds open, and even then the witnesses will only hear Floyd's last words.[24]

---

[21] Dana Ford, *Oklahoma executes Charles Warner*, CNN, January 16, 2015, https://www.cnn.com/2015/01/15/us/oklahoma-execution-charles-frederick-warner/index.html.

[22] Erik Eckholm, *Arizona Takes Nearly 2 Hours to Execute Inmate*, New York Times, July 23, 2014, https://www.nytimes.com/2014/07/24/us/arizona-takes-nearly-2-hours-to-execute-inmate.html.

[23] *See* Defendant's Notice of Filing, Exhibit A – Redacted Execution Manual, *supra* n. 10 (detailing the procedures for Floyd's execution).

[24] *Id.* at 56–57 ("The Warden will then open the Execution Area Viewing Room blinds and advise the condemned inmate that those witnessing the execution may now hear his last words.")

- EM 110.02(D)(1)(b), which states that "[i]f at any point, the Attending Physician determines that the condemned inmate's responses to the lethal drugs deviates from expected, the Drug Administrators, Warden and Director will pause the procedure, close the Viewing Room window blinds, and consult with the Attending Physician," and only if the execution is continued will the blind reopen.[25]

- EM 101.03(C), which states that "[t]he Director [of NDOC], in his sole discretion, shall determine whether to approve a member of the news media or other media representative to be a witness to the execution."[26]

- EM 101.03(C)(1), which states that "[a] person who has not been invited by the Director may not witness the execution."[27]

Furthermore, the procedures detailed in the Execution Manual do not describe any alternative means that otherwise qualified witnesses will be able to observe the execution if they are denied an invitation by the Director.[28] These limitations necessarily inhibit any witness's or potential witness's ability to observe and report on Floyd's execution.

**III. JURISDICTION AND VENUE**

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil-rights violations), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). Plaintiffs invoke this Court's jurisdiction pursuant to the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

Venue is proper pursuant to 28 U.S.C. § 1391(b). As a domestic Nevada corporation, the Plaintiff resides in this District. As the Defendant represents in its Execution Manual, the execution

---

[25] *Id.* at 58.

[26] *Id.* at 17.

[27] *Id.*

[28] *See generally*, *id.*.

1  of Floyd by the Defendant will occur at Ely State Prison, a facility in this District, so the events

2  giving rise to this Motion will occur in this District.

3  **IV. LEGAL STANDARD**

4  The standard for obtaining a temporary restraining order and preliminary injunction are

5  the same. *Quiroga v. Chen*, 735 F. Supp. 2d 1226 (D. Nev. 2010). In considering whether to

6  grant a temporary restraining order or a preliminary injunction pursuant to Fed. R. Civ. P. 65(a),

7  a court must consider whether "(1) [the plaintiff] is likely to succeed on the merits, (2) he is

8  likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities

9  tips in his favor, and (4) an injunction is in the public interest." *East Bay Sanctuary Covenant v.*

10 *Biden*, 993 F.3d 640, 668 (9th Cir. 2021). "When the government is a party, the last two factors

11 (equities and public interest) merge." *Id.* "These factors are evaluated on a sliding scale." *Id.*

12 **V. LEGAL ARGUMENT**

13 Under the factors laid out in *East Bay Sanctuary Covenant*, the Court must grant the

14 Plaintiff's request for a Temporary Restraining Order or, in the alternative, a Preliminary

15 Injunction. 993 F.3d at 668.  The Defendant's current protocols clearly and unambiguously violate

16 the Plaintiff's rights under the First Amendment. As the prospective harm to a First Amendment

17 right, it is presumed to be irreparable, and this presumption is cemented by the simple fact that

18 Floyd's execution will be irreversible and unrepeatable. Finally, considering that the Plaintiff, as

19 the press, must serve as the eyes and ears of the public for one of the most significant executions

20 in Nevada's history, the balance of equities and the public interest require this Court to grant the

21 Plaintiff's requested relief.

22  A.   **The Plaintiff is likely to succeed on the merits of this case because the State's**
23       **procedures clearly violates the First Amendment by interfering with the**
         **press's ability to observe Zane Floyd's execution in its entirety and without**
24       **obstruction.**

25 The public has a general right to access governmental proceedings under the First

26 Amendment of the United States. U.S. Const. amend. I; *Ryan*, 938 F.3d at 1075. In determining

27 what access must be granted to a particular governmental proceeding, a court must ask "(1)

whether the place and process have historically been open to the press and general public, and (2) whether public access plays a significant positive role in the functioning of the particular process in question." *Id*. The Ninth Circuit has previously applied this test to state executions and held that, "the public has a qualified First Amendment right to view executions in their entirety." *Id., citing Woodford*, 299 F.3d at 875–77. This right exists because "[e]xecution witnesses need to be able to observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered." *Id.* at 1076.

Prison administration *may* regulate executions in a manner than burdens the public's First Amendment right to access, but this authority is not unrestricted. Any regulation must be "reasonably related to a legitimate penalogical objective" and not an "exaggerated response to those concerns." *Id*. Additionally, if a regulation does not leave room for "case-by-case discretion," the regulation must be a "close fit" between the regulation and any legitimate penological objectives. *Id.* Regulations that do not satisfy these requirements will be struck down as unconstitutional. *See id.* (holding that a regulation preventing witnesses from hearing an execution in its entirety was unconstitutional). In applying the four factor "*Turner* test" relevant to this inquiry, a court must consider (1) "whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open" to the injured party, (3) what "impact accommodation of the asserted of the asserted constitutional right will have on the guards and other inmates, and on the allocation of prison resources generally," and (4) whether there are obvious, easy alternatives that fully accommodate the injured parties rights at *de minimis* cost to valid penological interests. *Id.* at 1077, *citing Turner v. Safley*, 482 U.S. 78, 89 – 91 (1987).

Four regulations described in NDOC's Execution Manual, EM 110.1, EM 110.02, EM 101.3(C), burden the press's and public's First Amendment right to observe Floyd's execution and fail the *Turner* test. Furthermore, the Defendant's possible use of cisatracurium under EM 103, failure to provide witnesses a method to hear what is occurring in the Execution Chamber, and

failure to provide alternative meanings to observe the execution for eligible witnesses who are denied an invitation also violate the Plaintiff's First Amendment rights.

        **1.**      **The procedures described in the Execution Manual violate the Plaintiff's First Amendment rights because the described procedures use blinds to prevent witnesses from observing Floyd while he is inside the Execution Chamber and suggest that witnesses will not be able to hear what is occurring in the Chamber when the blinds are closed.**

EM 110.01, which prevents witnesses from observing Floyd entering the execution chamber or the insertion of his IV, a procedure identical to California's Procedure 770, a procedure unequivocally struck down as unconstitutional by the Ninth Circuit Court of Appeals. Pursuant to California Procedure 770, executions would begin with a curtain "drawn over the windows [of the execution chamber] to obscure the witnesses' view." *Woodford*, 299 F.3d at 871. This meant that "witnesses were not permitted to watch [the condemned] as the guards brought him into the chamber, tied him down to the gurney, inserted the intravenous lines and left him alone to await the warden's order to dispense the chemicals." *Id.* "Witnesses, therefore, observed [the condemned] as he died, but were unable to the see the processes leading to that point." *Id.* The Ninth Circuit applied the *Turner* factors to Procedure 770 and held that the procedure violated the First Amendment. In turn, the court upheld a permanent injunction from the lower court prohibiting the prison, "from preventing uninterrupted viewing of executions from the moment the condemned enters the execution chamber through, to and including, the time the condemned is declared dead." *Id.* As EM 110.01 is identical to California Procedure 770, is necessarily unconstitutional under *Woodford*, and must be struck down.

      While EM 110.02 varies from California Procedure 770 in that it conceals the condemned after the execution is already under way rather than at the beginning, it still violates the letter of *Woodford* and the intent of *Ryan*. Drawing the blinds in the middle of the execution necessarily contradicts *Woodford*'s requirement that witnesses have "uninterrupted viewing" from the moment Floyd enters the chamber to when he is declared dead. *Id.* And when the Ninth Circuit reaffirmed *Woodford* in *Ryan*, it did so contemplating the execution of Joseph R. Wood, where an

experimental drug cocktail did not perform as planned and the executioners deviated from the set procedure. *Ryan*, 983 F.3d at 1073.  These are exactly the circumstances that would result in the blinds being drawn under EM 110.02. And rather than allowing executioners to hide such mishaps from the public, the Ninth Circuit expanded witnesses right to access by requiring that the government arrange for witnesses to not just see but *hear* when the cocktail does not perform as planned, stating that, "[e]xecution witnesses need to be able to observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered." *Id.* at 1076. EM 110.02 clearly violates the First Amendment.

Finally, the State's Execution Manual does not explain what witnesses will be able to hear coming from the Execution Chamber during Floyd's execution, but it suggests that witnesses will only be able to hear Floyd's final words after the blinds have been drawn back. "[T]he public and the press have a constitutional right to hear the sounds of the entire execution process." *Ryan*, 983 F.3d at 1076. An open microphone in the Chamber from the moment Floyd enters to his death would be acceptable, but the Execution Manual makes no such assurance. Without this accommodation, the procedure for Floyd's execution violates the First Amendment pursuant to *Ryan*.

> **2.      The State's procedures violate the Plaintiff's First Amendment rights when it gives the Director of the Nevada Department of Corrections unfettered authority to deny requests from media representatives for an invitation to Floyd's execution**

To attend the execution, news media and other media representatives must make a request for an invitation to NDOC's Public Information Officer ("PIO").[29] However, EM 101.03(C) states that "[t]he Director [of NDOC], in his sole discretion, shall determine whether to approve a member of the news media or other media representative to be a witness to the execution."

---

[29] Defendant's Notice of Filing, Exhibit A – Redacted Execution Manual, *supra* note 10, at 17.

According to the Execution Manual, there is no limit on this discretion nor is the Director required to provide an explanation for a rejection.

This regulation necessarily burdens the Plaintiff's First Amendment right to observe Floyd's execution. As such, the regulation is only permissible if it is "reasonably related to a legitimate penalogical objective" and not an "exaggerated response to those concerns." *Id.* at 1076. Furthermore, as the regulation applies to all requests regardless who submits them, it must be a "close fit" to the stated penalogical objective to survive review. *See id.*

On its face, the protocol fails to state a "penalogical objective" in giving the Director sole discretion in rejecting requests from the media. However, even if the protocol had provided one, the complete failure to limit the Director's authority or offer a mechanism for review exposes the protocol as an "exaggerated response" to any concern that may exist. *See Guardian News & Media*, 225 F.Supp.3d 859, 869 (D. Ariz. 2016) (finding that a procedure providing the Director of Arizona's Department of Corrections discretion to close the curtains of the witness viewing room violated the First Amendment even though the Defendant asserted that the Director would only exercise his authority pursuant to a legitimate penological purpose).

Looking to the *Turner* factors, the regulation offers no valid connection between a government interest and the Director's unlimited discretion, "close fit" or otherwise. Second, any person whose invitation is rejected has no alternative method to observe the execution as explicitly stated by EM 101.03(C)(1). Finally, there are viable alternatives, such as requiring the Director to (1) follow a set standard in determining whose requests will be denied, (2) provide an explanation for denials, and (2) provide an opportunity for appeal would have minimal impact on the rights of any other prison personnel or inmates, and would have *de minimis* cost to the State.

Giving the Director complete control over what, if any, media representatives observe the execution undermines the basic reason the First Amendment grants access to the proceedings in the first place. As explained in *Ryan*, "the public has a right to *independent* eyewitness accounts of the entire execution process. . . [r]eports of executions by the same prison officials who carry them out are not adequate substitutes." *Ryan*, 938 F.3d at 1077 (emphasis added). The current

procedure granting the Direct unfettered control over what witnesses may and may not attend

subverts this fundamental principle and necessarily violates the First Amendment.

> ### 3. The State's procedures violate the Plaintiff's First Amendment rights by failing to providing an alternative way to observe Floyd's execution to press outlets that have been denied an invitation to the execution such as broadcasting the execution on closed circuit television

Under EM 101.03(C)(1), which is based on NRS 176.355(4), "[a] person who has not been invited by the Director may not witness the execution." Even though this regulation stems from a Nevada statute, it necessarily burdens the public's right to observe Floyd's execution under the First Amendment so must be "reasonably related to a legitimate penological objective" and not an "exaggerated response to those concerns" to be valid. *Id.* at 1076. Furthermore, as the ban is not applied "case-by-case," it must be a "close fit" to the penological objective. *Id*. This regulation does not satisfy those requirements or the *Turner* factors.

Neither EM 101.03(C)(1) nor NRS 176.355(4) provides a "a valid, rational connection between" its blanket ban on any person not invited by the Director from witnessing the execution and a "legitimate governmental interest." While a legitimate government interest may exist to limit the number of witnesses physically present in the viewing chambers, to bar witnesses otherwise entitled to view the execution from observing through alternative means such as closed-circuit television serves no legitimate purpose. Under the plain language of EM 101.02(C)(1) and NRS 176.355(4), there is no alternative means for a media representative or a member of the public to exercise their First Amendment right if they do not receive an invitation from the Director. If a person does not receive the Director's invitation, they "may not witness the execution."

Reviewing the third and fourth *Turner* factors together, the Execution Manual does not currently provide any alternative accommodation to witnesses that have been denied invitation from the Director. However, such an "obvious, easy alternative" does exist using modern technology. Providing the means to view Floyd's execution at an off-site location, away from the Ely State Prison, would have minimal impact on other guards, inmates, and prison resources. It would also accommodate eligible witnesses who do not receive an invitation with *de minimis* cost

to valid penological interests. This alternative is not speculative. The federal government previously offered such an accommodation when it executed Timothy McVeigh, providing secure, off-site video feeds of McVeigh's execution when requested by witnesses that satisfied certain criteria. *Entertainment Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1008 (S.D. Ind. 2001). Furthermore, McVeigh was executed over two decades ago. With 20 years to improve internet and video technology, offering the opportunity to observe and hear the execution has a become an even more viable option. *See* David Lat & Zachary Shemtob, *The Execution Should Be Televised: An Amendment Making Executions Public*, 78 Tenn. L. Rev. 859, 864 (2011) ("The technological advances of the digital age make it easier than ever to make executions public while reducing logistical difficulties or the prospect of public disorder.").

Considered in their totality, the *Turner* factors weigh against the EM 101.02(C)(1) as it exists, rendering the regulation invalid under the First Amendment. The Defendant must offer a suitable alternative for witnesses denied an invitation by the Director to exercise their right to observe Floyd's execution pursuant to the First Amendment.

### 4.     The States' use of a paralytic agent to create a "chemical curtain" violates the Plaintiff's First Amendment right observe Floyd's execution it prevents the Plaintiff from observing and accurately report on the effects of Nevada's experimental drug cocktail.

As made clear in *Ryan*, the public's First Amendment right to observe an execution exists to ensure that the public has "full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies." *See* 938 F.3d at 1076 ("Barring witnesses from hearing sounds after the insertion of intravenous lines means that *the public will not have full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies*.") (emphasis added). In particular, the public's First Amendment right to observe executions is closely linked to the public's right to observe what, if any, pain the prisoner is in. *Woodford*, 299 F.3d at 876 (recognizing that the public must be able to observe an execution's "initial procedures," as these procedures were "possibly painful" and relevant to the ongoing debate surrounding the death penalty); *see also Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (considering "objective

evidence of pain," such as eyewitness accounts of a prisoner's suffering during an execution, relevant in determining whether a method of execution is constitutional); *California First Amendment Coalition v. Calderon*, 150 F.3d 976, 978 (9th Cir. 1998) ("Eyewitness media reports of the first lethal gas executions sparked public debate over this form of execution and the death penalty itself."). The State's inclusion of a paralytic agent like cistracurium into the drug cocktail inevitably burdens this right to "full information" regarding the "prisoner's experience" by creating a chemical curtain that (1) obscures the symptoms that the prisoner is suffering from witnesses and (2) disables the prisoner's ability to describing what they are experiencing.

This regulation is not connected to a legitimate penological objective. Considering that public has a right to information related to the prisoner's experience, additions to the cocktail that do not reduce prisoner suffering or induce death but exist solely to obscure what the prisoner is experiencing cannot be "legitimate."

The use of cisatracurium also fails to satisfy the *Turner* factors. First, there is no "legitimate governmental interest" justifying the use of a paralytic agent in a drug cocktail. It does not sedate the prisoner, reduce suffering, or carry out the actual killing. Rather, it only exists to create the *illusion* of reduced suffering. And if cistracurium is included, there is no "alternative means" for the public to see the effects of Nevada's experimental cocktail. Even if Floyd is experiencing a sensation of a blazing inferno in his veins, the public will only observe his limp form, and in his paralyzed state, Floyd will be unable to describe the brutal ordeal.

Barring the use of cistracurium will have little impact on guards, other inmates, or prison resources because the Execution Manual already offers an "obvious, easy alternative." The Manual describes a three-drug cocktail and a four-drug cocktail, and the cistracurium is only included in the four-drug cocktail. Preventing the Defendants from using cistracurium (or any other paralytic agent) simply requires them to use the three-drug option.

Considering the *Turner* factors in their totality, the use of the paralytic agent cistracurium unconstitutionally burdens the public's right to observe the execution in its entirety and have full information related to the prisoner's experience during the execution.

**B.    If this Motion is denied, the Plaintiff will suffer immediate and irreparable harm: there will be no way to reverse the harm to the Plaintiff's First Amendment rights if Floyd is executed under the current procedures described in the Execution Manual**

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *East Bay Sanctuary Covenant*, 993 F.3d at 677. Intangible injuries may qualify as irreparable harm because such injuries generally lack an adequate legal remedy. *Id.* (quotation omitted). In First Amendment cases, irreparable harm is presumed. *Michel v. Bare*, 230 F. Supp. 2d 1147, 1159 (D. Nev. 2002).

As it currently exists, the procedure will undeniably violate the Plaintiff's First Amendment rights, a harm that is presumed to be irreparable. Beyond this presumption, after Floyd is executed, the Plaintiff will have no recourse; by its very nature, the execution of Floyd cannot be performed a second time. And while Nevada may carry out other executions in the future, those executions will not carry the same significance. The Plaintiff, its members, and the public will suffer immediate and irreparable harm if Floyd is executed pursuant the procedure's laid out in NDOC's Execution Manual, which favors the issuance of a Temporary Restraining Order or Preliminary Injunction.

**C.  Considering that the Plaintiff, as the press, are the public's eyes and ears at Zane Floyd's execution, the public interest and the balance of equities favor granting the Temporary Restraining Order and Preliminary Injunction.**

The First Amendment grants the right to observe executions carried out by the state of Nevada, a grant necessary to carry out the public's duty to "determine whether lethal injections are fairly and humanely administered." *See Ryan*, 938 F.3d at 1076 (9th Cir. 2019) ("Execution witnesses need to be able to observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered."). While this duty is important under any circumstances, it is particularly important in the context of Floyd's execution.

Zane Floyd's execution has historical and social significance. Nevada has not executed a prisoner in over 15 years, and public conversation surrounding Nevada's death penalty has crescendoed during the last state legislative session. This will be the state's first execution at a

facility outside of the Nevada State Prison and at the new chamber in Ely. Finally, statistics and history make clear that there is a high likelihood that Nevada, with its untried cocktail, will botch Floyd's execution. Under these circumstances, having the press present and able to report on the execution, including errors, is crucial.

By comparison, the harm the Defendants will suffer if a Temporary Restraining Order or Preliminary Injunction is granted is *de minimis*. Floyd was sentenced to death in 2000 and has been pending execution for 21 years. The state has not executed anyone else in the last 15 years. A temporary delay to ensure that the Nevada public has full access to Floyd's execution as guaranteed under the First Amendment will not harm the Defendants.

//

//

//

//

//

//

//

//

//

## VI.    CONCLUSION

For these reasons, the Plaintiff respectfully requests that this Honorable Court grant its Motion for Temporary Restraining Order and Preliminary Injunction and further award the Plaintiff pre-judgment and post-judgment interest, actual damages, exemplary damages, costs and expenses, attorneys' fees, and all other relief to which the Plaintiff is entitled.

DATED this ___23rd___ day of ___July_____, 20 __21__

Pursuant to NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher Peterson*
JENNIFER B. SHOMSHOR
Nevada Bar No. 13248
CHRISTOPHER M PETERSON
Nevada Bar No. 13932
NICOLE C. LEVY
Nevada Bar No. 15061
AMERICAN CIVIL LIBERTIES UNION OF NEVADA
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Tel./Fax. (702) 830-9205 / (702) 366-1331
Email: Shomshor@aclunv.org
Email: Peterson@aclunv.org
Email: Levy@aclunv.org
*Attorneys for Plaintiffs*

**LR 5-1 PROOF OF SERVICE**

I HEREBY CERTIFY that on the ___23___ day of ___July___ ,20 _21_

I served:   ExParte Temporary Motion for Restraining Order and Preliminary Injunction

| X | | EM/ECF; |
|---|---|---|
| | | Electronic mail; or |
| X | | US Mail or Carrier Service |

Upon:   Governor Sisolak, 101 N. Capitol St. Carson City, NV 89701;Charles Daniels, Nevada Dept. Of Corrections, 5500 Snyder Avenue Bldg. 17, Carson City, NV 89701;William A. Gittere Ely State Prison, P.O. Box 1989 Ely, NV 89031; The State of Nevada 5500 Snyder Avenue Bldg. 17 Carson City NV, 89701; Nevada Attorney General Aaron Ford, 100 N. Carson Street, Carson City, NV 89701

Pursuant to NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

/s/ Tamika Shauntee

Tamika Shauntee
an employee of the ACLU of Nevada