AARON D. FORD
  Attorney General
Steve Shevorski (Bar No. 8256)
  Chief Litigation Counsel
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
(702) 486-3420 (phone)
(702) 486-3773 (fax)
sshevorski@ag.nv.gov

*Attorneys for Defendants the Hon. Stephen Sisolak,
Director Charles Daniels, Warden William Gittere, and
State of Nevada ex rel. its Department of Corrections*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| NEVADA PRESS ASSOCIATION,<br><br>        Plaintiff,<br><br>v.<br><br>STEPHEN F. SISOLAK, GOVERNOR; CHARLES DANIELS, DIRECTOR OF THE NEVADA DEPARTMENT OF CORRECTIONS; WILLIAM ALLAN GITTERE, WARDEN OF ELY STATE PRISON; STATE OF NEVADA EX REL. ITS DEPARTMETN OF CORRECTIONS (NDOC); and DOES 1-10, UNKNOWN NDOC PERSONNEL, IN THEIR OFFICIAL CAPACITIES AS AGENTS OF NDOC,<br><br>        Defendants. | Case No. 3:21-cv-00317-RFB-CLB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Defendants, the Honorable Stephen Sisolak, Director Charles Daniels, Warden Allan Gittere, and the State of Nevada ex rel. its Department of Corrections (collectively, "State Defendants"), oppose Plaintiff Nevada Press Association's (**NPA**) *ex parte* motion for temporary restraining order.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    Introduction**

This Court should deny NPA's motion. NPA purports to agree that this case involves little more than a straight-forward application of *Cal. First Amendment Coalition v.*

*Woodford*, 299 F.3d 868, 877 (9th Cir. 2002) and its progeny. But nearly every argument NPA makes is foreclosed by the proper application of those cases.

State Defendants agree that *Woodford* requires that the blinds in the execution viewing room must be open from the moment Floyd enters the execution chamber and will revise the Execution Manual accordingly in the next 30 days. However, none of NPA's other arguments have merit. Nothing in First Amendment jurisprudence supports NPA's view that appellate review of a denial of media access to a prison is required, that an execution be live-streamed, or that a media organization has standing to challenge the drugs in the execution protocol.

The First Amendment guarantees that the media has the same access to view an execution as the general public. That is precisely what the media receives under Nevada law. The First Amendment does not command more.

## II.   Procedural background

This case concerns Zane Floyd's forthcoming execution. Lucy Tarantino, Thomas Darnell, Chuck Leos, and Dennis "Troy" Sargent were working at Albertsons on West Sahara Avenue on June 3, 1999.[1] Floyd killed them with a 12-gauge shotgun.[2] A jury of Floyd's peers sentenced him to death. ECF No. 1 at ¶13.

NPA is a press trade association. *Id.* at ¶1. Defendants are state officials and the NDOC. *Id.* at ¶¶2-5. NPA brings four claims under the First Amendment. *Id.* at ¶¶31-54. Their First Amendment theories target the State Execution Manual ("Execution Manual" or "EM"), NRS 175.355(4), and the use of cistracuriam in the execution protocol. *Id.* at ¶¶33-34, 38, 42-43, and 50-51. NPA seeks declaratory and injunctive relief. *Id.* at 13-14.

. . .

. . .

. . .

---

[1] *DA to proceed with death penalty against gunman in 1999 store killings*, Las Vegas Rev. J., https://www.reviewjournal.com/crime/courts/da-to-proceed-with-death-penalty-against-gunman-in-1999-store-killings-2315637/.)
[2] *Id.*

### III. Factual and legal background

#### A. Nevada Revised Statues on judgments and executions

Nevada statutory law does not contain specific provisions regarding media witnesses at a condemned inmate's execution. NDOC's Director is required to determine the maximum number of witnesses and to give preference to eligible family representatives of the victim(s). NRS 176.355(2)(e). Uninvited persons cannot be witnesses. NRS 176.355(4).

#### B. Sections of Nevada's Execution Manual at issue

Plaintiff contends that four sections of the EM are improper, EM 110.1, EM 110.02(D)(1)(b), EM 101.03(C), and EM 101.03(C)(1). ECF No. 1 at ¶¶25-28. Each will be described.

EM 110.1 describes NDOC's final preparation of the condemned inmate. **Ex. A**, RP00055. This section describes how the condemned is led to the execution chamber, how they are secured at the table, and how they are physically prepared for lethal injection and cardiac monitoring. *Id*. at RP00055-56. Plaintiff objects that the viewing room blinds are closed until this preparation is complete. *Id*. at RP00057.

EM 110.02 describes the condemned inmate's execution. *Id*. at RP00057-61. One section is at issue. EM 110.02(D)(2)[3] provides that the viewing room blinds will be closed "[i]f at any point, the Attending Physician determines that the condemned inmate's responses to the lethal drugs deviates from as expected…," but are reopened if the execution is to continue. The purpose of closing the blinds is to allow the Drug Administrators, the Warden, and the Director to consult with the Attending Physician. *Id*. at RP00057.

EM 101.03 concerns media witnesses to the condemned inmate's execution. *Id*. at RP00016. Two subsections are at issue. EM 101.03(C) grants NDOC's Director discretion to approve a news media member to witness the execution. *Id*. Subsection (C)(1) disallows uninvited persons from viewing the condemned inmate's execution, consistent with NRS 176.355(4). *Id*.

---

[3] NPA misidentifies this section as EM 110.02(D)(1)(b). *See* ECF No. 1 at ¶26.

EM 103 concerns the lethal injection protocol. The Director may choose a 3 or 4 drug protocol. *Id*. at RP00022. The four-drug protocol uses cisatracurium but the 3-drug protocol does not. *Id*.

### C. Interaction of NDOC Administrative Regulation (AR) 120 and EM 101

NDOC promulgated AR 120 to elucidate its policies regarding "news media contact and dissemination of information." **Ex. B** at 1. *Compare* **Ex. A**, EM 101.03 at RP00016 and **Ex. B**, 120.06(6) at 8. The Execution Manual and AR 120 govern the media's attendance at condemned inmate's execution is governed by the Execution Manual and AR 120. *Id*.

EM 101.03(B) details how media personnel can seek to be witnesses of the condemned inmate's execution. **Ex. A**, EM 101.03(B). Media members who wish to witness the execution must send a written request to NDOC's press information officer on company letterhead within one week of the issuance of the execution warrant. *Id*. The Director has discretion whether to approve the member of the media to attend the execution. *Id*. at 101.03(C).

AR 120.06(6) details how members of the media are chosen to be among the media pool submitted to the Director for selection to be media witnesses. NDOC's press information officer chooses media members randomly using objective criteria to fill up to six viewing seats. **Ex. B**, AR 120.06(6). The six viewing seats must include, first, up to two members from the county of the condemned inmate's sentencing. *Id*. at 120.06(6)(A). Second, up to two Nevada media representatives from outside the county of the condemned inmate's sentencing. *Id*. at 120.06(6)(B). Third, one international wire service operating form and based in Nevada. Id. at 120.06(6)(C). Lastly, one media member from Nevada chosen based on the circumstances of subject execution. *Id*. at 120.06(6)(D).

### IV. Legal standards

To succeed, NPA must demonstrate: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy that is not awarded as of right. *Winter*, 555 U.S. at 24.

## V. Legal discussion

### A. NDOC will revise EM 110.1 and EM 110.02 consistent with *Woodford* and its progeny

NPA's first cause of action seeks to remedy an observational harm because of the use of blinds in the execution chamber after the condemned inmate enters the chamber. ECF No. 1 at ¶¶33-34. State Defendants concede the use of blinds as contemplated by EM 110.1 and EM 110.02 is not consistent with precedent in this Circuit.

Under Ninth Circuit precedent, "the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Woodford*, 299 F.3d at 877. NDOC will revise the Execution Manual to keep faith with *Woodford* ensuring that witnesses can observe the process for the condemned inmate's execution after they enter the chamber.

However, a preliminary injunction is unnecessary given the circumstances. A preliminary injunction should not issue unless necessary to preserve the status quo pending a determination of a case on its merits. FED. R. CIV. P. 65; *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009); 11A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2947 (3rd ed. 2013). NPA's First Amendment right to observe Floyd's execution is not under any imminent threat pending a trial on the merits.

An execution cannot proceed without a warrant of execution signed by the judge in Floyd's case. NRS 176.345(1). There is no such warrant currently. There is no date for Floyd's execution. NPA does not contend otherwise. NPA never explains what irreparable harm it will suffer prior to a trial on the merits. NDOC agrees it will revise EM 110.1 and EM 110.02 to ensure there is no doubt regarding whether it is consistent with *Woodford* in

. . .

30 days – well before any forthcoming execution of Floyd.  Thus, a preliminary injunction is not necessary to preserve the status quo.

### B. NPA lacks a likelihood of success on the merits of its other theories

Section 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).  Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

To state an actionable claim under § 1983, a plaintiff must allege two essential elements: (1) a person violated a right secured by the Constitution or laws of the United States and (2) said person acted under the color of state law when they committed the alleged violation.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda Cty.*, 811 F.2d 1243, 1245 (9th Cir. 1987).  Apart from the issue of the blinds addressed in Part V(A) above, NPA makes three other arguments under the First Amendment.  None have merit.  And so, NPA's theories under §1983 fall down on the first element.

Because NPA does not have a likelihood of success on the merits, this Court need not consider the other *Winter* elements.

#### 1. NPA distorts *Ryan* to create a duty to amplify sound

NPA alleges that "the State's Execution Manual does not explain what witnesses will be able to hear coming from the Execution Chamber…" ECF No. 1 at ¶35.  NPA's reliance on *First Amendment Coalition of Ariz. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019) is misplaced.  In *Ryan*, the State of Arizona's construction of the execution chamber with a sound proof window made auditory scrutiny impossible.  *Id*. at 1076.  In contrast to *Ryan*, there is nothing in Nevada law, the Execution Manual, or NDOC's Administrative Regulation showing that Nevada inhibits the media from covering the execution process.

NPA's speculative argument regarding the execution chamber's auditory qualities is barred by *Winter*.  NPA cannot meet its burden on a preliminary injunction motion by assuming that its First Amendment right will be impermissibly burdened prior to a trial

on the merits. *Winter*, 555 U.S. at 22. All the court in *Ryan* decided was that Arizona could not eliminate through a sound proof window the media's ability to hear. *Ryan*, 938 F.3d at 1076. NPA does not argue, let alone cite evidence, that Nevada's execution viewing room is like Arizona's.

NPA asks this Court to order the State Defendants to enhance the execution chamber's sound through electronic means. ECF No. 2 at 13-16. The court in *Ryan* merely held that historically the public and the media could hear the execution, "even if not with perfect clarity." *Ryan*, 938 F.3d at 1075. Nothing in this Circuit's case law requires enhancement of the execution chamber's auditory capabilities.

Because the State Defendants voluntarily desire to keep faith with transparency, they will equip the Execution Chamber with a supplementary audio feature such as a microphone and speakers. **Ex. C**, Declaration of Warden William Gittere at ¶¶9-10.

### 2. EM 101.03(C) passes constitutional muster

The Supreme Court has long held that neither the First nor Fourteenth Amendments mandate a right of access to government information or sources of information within the government's control and that the media have no special right of access to prisons beyond that afforded to the public. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 16-17 (1978) (plurality opinion) (citing *Pell v. Procunier,* 417 U.S. 817 (1974); *Saxbe v. Washington Post, Co,* 417 U.S. 843 (1974)).

NPA contends having to submit a written request to attend the execution violates their First Amendment rights. ECF No. 2 at 20-21. NPA also argues that state law giving the Director unfettered discretion to deny a written request to attend does not meet constitutional muster. *Id.* at 21:1-2. Precedent forecloses NPA's argument. *Houchins*, 438 U.S at 16-17.

By focusing on EM 101.03(C), NPA bypasses NRS 176.357(1). That section shows that the requirement for a written request to attend applies to both the media and the victims' families. By seeking to exempt itself from the written request requirement, NPA mistakenly elevates itself above the victims' families. NPA forgets that the press' access to

observe an execution is "coextensive" with that of the general public, not greater. *Woodford*, 299 F.3d at 873 n.2. There is no unfettered right of access for the general public to view an execution under Nevada law. NRS 176.355(4). An uninvited person may not attend. *Id*. Only members of the victim's family receive a preference to attend, but they, like the press, must make a written request to attend the execution. NRS 176.357(1).

The same analysis applies to NPA's attack on the Director's discretion to approve any person's attendance at Floyd's execution. This Court's analysis under *Woodford* should start and end with the text of NRS 176.355(2)(e). Under that subsection, the Director must "[i]nvite a competent physician, the county coroner, a psychiatrist, and not less than six reputable citizens over the age of 21 years to be present." Nothing in this subsection discriminates against the media in general or NPA in particular. To be sure, the legislature empowered the Director with discretion to control attendance, but such discretion applies equally to anyone who is not the selected physician, coroner, and psychiatrist.

NPA's assertion that the Director's discretion is limitless simply ignores AR 120.06(6). That administrative regulation explains that media witnesses are chosen randomly "to ensure consistency and fairness." **Ex. B**, AR 120.06(6). The selection ensures that the media is represented by an international wire service and media from inside and outside the county of sentencing. *Id*. at AR 120.06(6)(A)-(D). The Ninth Circuit found fault with Arizona because the media had to rely on secondhand information from prison officials who carried out the execution. *Ryan*, 938 F.3d at 1077. That is not true in Nevada. Under *Ryan*, "the public has a right to independent eyewitness accounts of the entire execution process," (*Ryan*, 938 F.3d at 1077) and that is just what they get under AR 120.06(6).

NRS 176.355(4), EM 101.03(C) and AR 120.06(6) easily pass muster under the *Turner* factors. *Turner v. Safely*, 482 U.S. 78, 89-91 (1987). In determining whether a restriction on the exercise of rights is reasonable or exaggerated in light of those penological interests, four factors are relevant: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open

to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" and (4) whether there exist "ready alternatives ... that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 89–91.

There is a valid, rational connection between NRS 176.355(4), EM 101.03(C) and AR 120.06(6) and the reason the legislature gave for granting the Director discretion to control who has access to the execution chamber viewing room. Controlling access to prison facilities to ensure the safe completion of prison operations is a legitimate penological interest. The execution viewing room is also a limited space. Nevada law requires preference for a place within the viewing room be given to the victims' families. NRS 176.355(2)(e). AR 120.06(6) provides for up to six media witnesses, which are in addition to the victims' family and others invited by the Director under EM 102.01(B). **Ex. A**, EM 102.01(B) at RP0000018. Ensuring that Floyd's execution can be safely carried out and witnessed requires "expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez,* 416 U.S. 396, 404–05 (1974), *limited on other grounds by Thornburgh v. Abbott,* 490 U.S. 401 (1989). This Court should not second-guess how the Director balances these interests.

There are no viable alternatives to giving the Director discretion to decide who may attend and witness Floyd's execution. NPA advances a scheme for appellate review of the Director's decision to not allow a particular member of the press an invitation to witness an execution. ECF No. 2 at 21:16-22. NPA's argument is deeply flawed since it would grant appellate rights to the media but no one else. *Woodford*, 299 F.3d at 873 n.2. NPA's argument that granting appellate review of a Director's decision to deny attendance would cause minimal delays or cost is naïve at best. NPA offers no limit to the potential plaintiffs who would have standing to seek review, no time limit for resolving these new lawsuits, no limit to the appellate review it desires.

. . .

Finally, media members who do not receive invitations to attend a condemned inmate's execution have a ready alternative. They can rely on the original reporting of those media members who attend. NPA never disputes that its members rely on original reporting of others such as a wire service as a common practice to cover newsworthy events. Nothing in First Amendment jurisprudence requires the government to provide special access to members of the media to executions. *Pell*, 417 U.S. at 834.

### 3. The First Amendment does not compel State Defendants to live stream a condemned inmate's execution

This Court need not tarry long over NPA argument that the First Amendment compels State Defendants to broadcast via close circuit television or the internet Floyd's execution. No such right exists.

The media have no special right of access to prisons beyond that afforded to the general public. *See Houchins*, 438 U.S. at 16-17. The public has no First Amendment right to broadcast over the internet or closed circuit television an execution and neither does the media. And that is precisely what the authority NPA cites to his court held. *Entm't Network, Inc. v. Lappin*, 134 F.Supp.2d 1002, 1013-14 (S.D. Ind. 2001) ("The foregoing survey of decisions in this and similar areas persuades the court that the right ENI asserts—the right to record or broadcast an execution from within a prison—does not exist.")

### 4. NPA lacks standing to challenge the drugs used in the execution protocol

Standing requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages . . .

or civil penalties. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 185 (2000).

NPA's challenge to the use of cisatracurium is a non-starter. Media plaintiffs do not have a First Amendment right of access to even know the execution drugs, as the Ninth Circuit made clear:

> Because the First Amendment right of access to governmental proceedings does not entitle the plaintiffs to information regarding execution drugs and personnel as a matter of law, the district court did not abuse its discretion by dismissing with prejudice those aspects of the plaintiffs' claim relating to such information.

*Ryan*, 938 F.3d at 1080. Since there is no right under the First Amendment for media plaintiffs to even know the identity of the drugs used, there cannot conceivably be a First Amendment right for a media plaintiff to challenge the state's use of a particular drug.

NPA then argues that the use of cisatracurium injures media plaintiffs such as NPA by denying them "full information" of the "prisoner's experience." Taken to its logical extreme, NPA's argument would include a right to interview a condemned inmate during the execution to get "full information" on the "experience" but precedent forecloses media plaintiffs from attempting to use the First Amendment as a cudgel to compel the government to even allow the press the right to even interview an inmate. *Houchins*, 438 U.S. at 15-16. No precedent supports NPA's view that they can use the First Amendment to challenge the state's use of particular drugs in an execution protocol to enhance their information gathering ability.

. . .

. . .

. . .

## VI. Conclusion

For these reasons, NPA has failed to meet its burden to obtain injunctive relief. This Court should deny its motion.

DATED this 9th day of August, 2021.

AARON D. FORD
Attorney General

By: /s/ *Steve Shevorski*
Steve Shevorski (Bar No. 8256)
Chief Litigation Counsel
*Attorneys for Defendants*
*The Hon. Stephen F. Sisolak, Director Charles Daniels, Warden William Gittere, and State of Nevada ex rel. its Department of Corrections*