JENNIFER B. SHOMSHOR
Nevada Bar No. 13248
CHRISTOPHER M. PETERSON
Nevada Bar No. 13932
NICOLE C. LEVY
Nevada Bar No. 15061
AMERICAN CIVIL LIBERTIES UNION OF NEVADA
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Tel./Fax. (702) 830-9205 / (702) 366-1331
Email: Shomshor@aclunv.org
Email: Peterson@aclunv.org
Email: Levy@aclunv.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| Nevada Press Association,<br><br>Plaintiff(s),<br><br>vs.<br><br>Steve Sisolak, Governor; Charles Daniels, Director of the Nevada Department of Corrections; William Allan Gittere, Warden of Ely State Prison; the State of Nevada, ex. rel. Department of Corrections; and Does 1–10, Unknown NDOC Personnel, in their official capacities as Agents of NDOC,<br><br>Defendant(s). | Case No. 3:21-cv-00317-RFB-CLB<br><br>REPLY IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

The Nevada Press Association, by and through undersigned counsel, to respectfully offers these points and authorities in support of its Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction. The Nevada Press Association by counsel and pursuant to Fed. R. Civ. P. 65 has moved the Court for a Temporary Restraining Order and Preliminary Injunction enjoining the State from executing Zane Floyd using the procedure described in the State's Execution Manual. The State filed an Opposition to that Motion on August 9, 2021. Plaintiff now offers this reply to the arguments raised in the Opposition.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  The Plaintiff is entitled to a preliminary injunction; Floyd's execution is imminent and will occur before a trial on the merits is held in this case.**

The State acknowledges that the current procedures for Floyd's execution violate the Plaintiff's First Amendment rights as described in *Woodford*, but it claims that Floyd's execution is not imminent because a death warrant has not issued. Def.'s Opp'n to Pl.'s Ex Parte Mot. for TRO and Prelim. Inj. ("Def.'s Opp'n"), 3:21-cv-00317-RFB-CLB (D. Nev. August 9, 2021), ECF No. 11, 5:24–5:26. State's Opposition fails to mention that the Nevada Eighth Judicial District Court, where Floyd was originally convicted, issued an order for his execution on June 9, 2021, with an original execution week set for July 26, 2021. Second Supplemental Order of Execution, 99C159897 (Nev. Eighth Jud. Dist. Ct. June 9, 2021). The only reason a death warrant did not immediately follow was due the order being temporarily stayed in Nevada state and federal courts. Decision and Order Granting Motion to Stay Proceedings Under NRAP 8(a)(1)(A) Pending Resolution of Defendant's Petition for Writ of Mandamus and Prohibition Seeking Disqualification of the Clark County District Attorney's Office, 99C159897 (Nev. Eighth Jud. Dist. Ct. June 9, 2021); Order granting Plaintiff's Motion for Temporary Restraining Order; Motion for Preliminary Injunction; Motion for Stay of Execution, Floyd v. Daniels, No. 3:21-cv-00176-RFB-CLB (D. Nev. June 10, 2021), ECF No. 128.  These stays are not permanent and not within Plaintiff's power to control.  Once the stays are lifted, the court in which the conviction was had *must*, upon application of the State, cause a warrant to be drawn. NRS 176.495. When that warrant is issued, the execution can occur as soon as 14 days after the date of the warrant. *Id.* At most, the issuing court could delay the execution 30 days from the day the warrant is issued. *Id.* Considering how long Floyd has been on death row, an execution occurring within a several weeks is certainly imminent.

The likelihood that another execution warrant will issue and Floyd will be executed before hearing this matter on the merits is high. Plaintiff is entitled to the requested relief.

**II. The State is incorrect when it suggests that the ruling in *Ryan* is limited to soundproofed execution chambers and so does not apply here**

The Ninth Circuit's ruling in *Ryan* did not hinge on Arizona's Execution Chamber being "soundproof", as the State suggests; Rather, the *Ryan* Court emphasized the public's right to have "full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies," while ruling that the witnesses must be able to hear the sounds of the execution. *First Amendment Coalition of Arizona v. Ryan*, 938 F.3d 1069, 1076 (9th Cir. 2019)

Unless a State-imposed limitation satisfies the *Turner* test, witnesses are entitled to the same access to today's executions as they had when these events were held in the public square. *See California First Amendment Coalition v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (reviewing to the practices of historical executions to determine the scope of the First Amendment right to observe an execution). Here the State has decided to place a physical limitation, specifically a wall, between Floyd and the witnesses during the execution, a set up similar to the layout under consideration in *Ryan*. 938 F.3d at 1073 ("Under Arizona's current procedures, witnesses observe the execution in a designated witness room adjacent to the execution room."). When executions were originally conducted in Nevada, prior to the transition to prisons, the State erected physical barriers between witnesses and the condemned. If the State now decides to put up such a barrier, it must make accommodations to ensure that witnesses have the same access to the sounds in the Execution Chamber as they would have in the public square.

Plaintiff here asks for such an accommodation with an open microphone in the closed Execution Chamber, the same accommodation asked for and granted in *Ryan*. 938 F.3d at 1078. Plaintiff is entitled to the requested relief.

**III. EM 101.03(c) fails to pass "constitutional muster" because it fails to limit the Director's discretion about who may witness the execution.**

Despite the State's claims to the contrary, Plaintiff has not asked for special media privileges or to exempt the press from requesting an invitation to Floyd's execution in writing. These arguments by the State confuse Plaintiff's actual issue with EM 101.03(c), specifically that

the regulation grants the Director unlimited discretion to refuse a potential invitee without explanation in violation of the First Amendment.

The State is wrong when it suggests that AR 120.06(6) limits the Director's discretion. Def's Opp'n at 8:14–8:22. On its face, AR 120.06(6) only limits the discretion of the Public Information Officer (PIO); the Director is not referenced at all. Nothing in AR 120.06(6) prohibits the Director from refusing an invitation to an invitee chosen by the PIO or extending an invitation to news organization not previously identified by the PIO. And even if AR 120.06(6) restrained the Director's authority, the regulation is a paper tiger. Besides a limited exception related to financial reporting, NDOC is exempt from Nevada's Administrative Procedures Act, meaning that NDOC can unilaterally change its regulations without notice. NRS 233B.039(1)(b). And NDOC does not view this power as theoretical – the agency was in the news last year for changing its agency regulations related to inmate accounts, increasing deduction limits to 80% without any notice to the public or the Board of State Prison Commissioners. *See* Dana Gentry, *Nevada prisons raid inmate accounts in delay response to Marsy's Law*, Nevada Current, September 4, 2020, https://www.nevadacurrent.com/2020/09/04/nevada-prisons-raid-inmate-accounts-in-delayed-response-to-marsys-law/. NDOC has the same power to change AR 120.06(6) without notice.

As for NRS 176.355, a statute cannot authorize an executive official to regulate a First Amendment right without sufficient limits on that authority. A statute that grants a "government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers" is unconstitutional. Kaahumanu v. Hawaii, 682 F.3d 789, 802 (9th Cir. 2012). While the First Amendment right at issue here is about access rather than expression, the problem is the same. NRS 176.355 places only three limited requirements on the Director: (1) invite a physician, a coroner, and a psychiatrist to the execution, (2) ensure "six reputable citizens over the age of 21" are present, and (3) give preference to the victim's family when selecting witnesses for the execution. Considering that the statute does not define who qualifies as a "reputable citizen," the Director has complete control over who receives the nine invitations he is required to provide and ultimately how many witnesses may attend. *Id.*

According to EM 101.03(c), this means he also has the unbridled authority to exclude witnesses that may engage in "disfavored speech" after the execution. This failure to limit the Director's authority necessarily violates the First Amendment.

Finally, the State attempts to justify the Director's near limitless discretion under the *Turner* factors by claiming that Director's must have unfettered control to "ensure safe completion of the prison operations." Def.'s Opp'n at 9:7–9:9. It also offers that "[t]he execution viewing room is also a limited space." Def.'s Opp'n at 9:9. However, the State's justifications are not reflected in EM 101.03(c). *See Guardian News & Media v. Ryan*, 225 F.Supp.3d 859, 869–70 (D. Ariz. December 21, 2016) (refusing to find a regulation granting officials broad discretion to limit access to an execution constitutional based on the State promise to use that discretion for a "legitimate penological objective"), *citing United States v. Stevens*, 559 U.S. 460, 480, 130 S. Ct. 1577, 1591, 176 L. Ed. 2d 435 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). According to that regulation, the Director may refuse an invitation to a witness even if space is available and the witness is not a safety concern. This is precisely why Plaintiff is asking for the Court to order the State to put limits on the Director's authority so his authority is shaped by actual penological interests rather than the Director's whims.

As it currently stands, the lack of limits on the Director's power to deny a request for an invitation to Floyd's execution violates the First Amendment. Plaintiff is entitled to the requested relief.

**IV.   The First Amendment compels the State to provide alternative means to view the execution for otherwise eligible witnesses who are denied an invitation**

Traditionally, executions were held in public spaces open to all who wished to attend, and the First Amendment right of access described in *Ryan* and *Woodford* is rooted in this tradition. *Ryan*, 938 F.3d at 1075; *Woodford*, 299 F.3d at 875–76. While courts permitted the State to place limitations on this First Amendment right as executions moved from open public spaces to prisons due to the inherent security concerns of the later, these same courts have required such limitations

be based in a legitimate penological interests. *Ryan*, 938 F.3d at 1076. For much of the last century, requiring all witnesses attend in-person may have served such interests. After all, there were few ways for witnesses to observe executions except for in-person due to technological limitations, and theoretically only so many outsiders that can physically enter a prison without disrupting the facility's normal operations.

But as technology evolves, so do the constitutional rights affected by that evolution. *See* Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 698, 112 S. Ct. 2711, 2718, 120 L. Ed. 2d 541 (1992) (J. Kennedy, concurring) ("We have allowed flexibility in our doctrine to meet changing technologies in other areas of constitutional interpretation, and I believe we must do the same with the First Amendment."); *Carpenter v. United States*, 138 S.Ct. 2206 (2018) (expanding defendant's expectation of privacy under the Fourth Amendment due to developments in cell phone technology); *Heyer v. United States Bureau of Prisons*, 984 F.3d 347 (4th Cir. 2021) (finding that the First Amendment gave deaf inmate the affirmative right to access a videophone, a technology that did not exist at the time of the amendment's ratification). The State seems to suggest that there are only two possible options for it to provide access to the Floyd execution, either an unrestricted broadcast to the public at-large or permitting only in-person witnesses with those observers serving as proxies for the general public. Def.'s Opp'n at 10:9–10:19. This is a gross simplification, and the Plaintiff has not asked for either. The Plaintiff requests that the State provide alternative means, using commonly-known technology, to observe the execution for witnesses who have been denied an invitation but would be otherwise eligible to attend. While the Plaintiff has suggested a controlled off-site location with a closed-circuit live feed, there are certainly other methods that would serve the same purpose.

The State cites *Lappin* when it claims that Plaintiff is not entitled to the requested relief. Def.'s Opp'n at 10:15–10:16. While the facts of *Lappin* are helpful in establishing that the Plaintiff's suggestion is feasible without running afoul a valid penological interest, the legal analysis in *Lappin* is not relevant to this case because (1) the *Lappin* plaintiffs sought a fundamentally different objective than Plaintiff here and (2) the *Lappin* defendants offered

explanations for their regulations that satisfied their obligations under *Turner*. In *Lappin*, the plaintiffs were not challenging limitations on their own access to McVeigh's execution but rather the defendant's refusal to let them publicly broadcast what they were observing. *Ent. Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1007–08. (S.D. Ind. 2001). In turn, the *Lappin* defendants advanced "four purposes for [this refusal]: '(i) the prevention of the sensationalizing of executions, (ii) the preservation of the solemnity of executions, (iii) the maintenance of security and good order in the Federal Prison System, and (iv) protection of the privacy rights of a condemned individual, the victims, their families and those who participate in carrying out the execution,'" and so satisfied their burden under the *Turner* factors. *Id.* at 1017. By comparison, the State has not provided any justification here for (1) denying all witnesses without an invitation from observing the execution or (2) why it has failed to provide accommodations for these witnesses when they would be otherwise eligible to attend. As such, Plaintiff is entitled to the requested relief.

### V. Plaintiff has standing to challenge the State's use of a paralytic agent that serves no purpose other than to violate Plaintiff's First Amendment right to know Floyd's experience during the execution

The State is wrong when it claims that Plaintiff lacks standing pursuant to *Lujan*. The Plaintiff, like the rest of the public, has a First Amendment right to know what Floyd is experiencing during his execution. *See Ryan*, 938 F.3d at 1076. If the State is permitted to use a paralytic agent in its drug cocktail, the Plaintiff will be unable to access this information, violating Plaintiff's right under the First Amendment. That harm is "fairly traceable" to the State's use of cisatracurium, a paralytic agent included in the cocktail specifically to obscure what Floyd is experiencing during the execution. If the State is barred from using cistracurium or any other paralytic agent, this harm to Plaintiff's First Amendment rights will be prevented.

The State's Opposition confuses the right to know information held by the government with the right to prevent an unconstitutional action. Whether the Plaintiff is entitled to know the specific chemicals the State intends to use in its cocktail is irrelevant to this case and the relief Plaintiff currently seeks. What is relevant is that the State intends to take an action that will impact

1  Plaintiff's rights under the First Amendment, and Plaintiff has standing to enjoin the State from
2  doing so. In this way, Plaintiff's standing mirrors Floyd's right to challenge the composition of
3  State's drug cocktail under the Eighth Amendment with having the right to know what drugs are
4  in the cocktail under the First Amendment. *Compare Ryan*, 938 F.3d at 1080 (denying that inmates
5  have a First Amendment right to know the chemicals in a lethal injection cocktail) *with Baze v.
6  Rees*, 553 U.S. 35 (2008) (recognizing an inmate's right to challenge the composition of a lethal
7  injection cocktail as a violation of the inmate's Eighth Amendment rights). The State's power to
8  hold some information in confidence does not give it the authority to violate Plaintiff's
9  constitutional rights just because that violation involves that information.

10        The State's arguments regarding interviews in the Execution Chamber ignore the limits the
11  *Turner* test places on the First Amendment right to access in the context of an execution. Def.'s
12  Opp'n at 11:13–11:21. If the State has legitimate reasons to deny interviews in the Execution
13  Chamber presumably it could satisfy its burden under the *Turner* test to justify the restriction.
14  Looking at the issue actually raised by Plaintiff, the State simply failed to offer any explanation to
15  justify the use of a paralytic agent in its cocktail. Without a legitimate penological objective, the
16  State's use of such an agent is an unconstitutional limitation on Plaintiff's First Amendment right
17  to know Floyd's experience during the execution. Plaintiff is entitled to the requested relief.

19     DATED this _____ day of _____, 20 ___

*/s/ Christopher Peterson*
CHRISTOPHER M PETERSON
Nevada Bar No. 13932
AMERICAN CIVIL LIBERTIES UNION OF NEVADA
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Tel./Fax. (702) 830-9205 / (702) 366-1331
Email: Peterson@aclunv.org
*Attorneys for Plaintiffs*

**LR 5-1 PROOF OF SERVICE**

I HEREBY CERTIFY that on the 16th day of August, 20 21

I served: Reply in Support of Plaintiff's Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction

X  EM/ECF;

☐  Electronic mail; or

☐  US Mail or Carrier Service

Upon: Steve Shevorski (Bar No. 8256)
Chief Litigation Counsel
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
(702) 486-3420 (phone)
(702) 486-3773 (fax)
sshevorski@ag.nv.gov

Pursuant to NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

/s/Christopher Peterson
Christopher Peterson
an employee of the ACLU of Nevada